**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

SUSAN E. PETTIT, et al.,    :
                            :
            Plaintiffs,     :        Civil Action No.
                            :        09-cv-3735 (NLH)
     v.                     :
                            :        **OPINION**
STATE OF NEW JERSEY, et al.,:
                            :
            Defendants.     :

---

**APPEARANCES**:
STEPHEN FREDERICK FUNK
JACOBS & BARBONE PA
1125 PACIFIC AVENUE
ATLANTIC CITY, NJ 08401
*Attorney for Plaintiffs Susan E. Pettit and George R. Lopez*

THOMAS EDWARD KEMBLE
OFFICE OF THE NJ ATTORNEY GENERAL
25 MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0112
*Attorney for Defendants State of New Jersey, New Jersey State Police and Ernest Lucarini*

JOHN J. BANNAN
THOMAS B. REYNOLDS
REYNOLDS DRAKE WRIGHT & MARCZYK
29 NORTH SHORE ROAD
ABSECON, NJ 08201
*Attorney for Defendants* City of Estell Manor and Mayor of Estell Manor Joseph Venezia

**HILLMAN, District Judge**

        Plaintiffs, Susan E. Pettit (hereinafter "Pettit") and

George R. Lopez (hereinafter "Lopez"), allege Defendants, State

of New Jersey, New Jersey State Police, Ernest Lucarini

(hereinafter "Lucarini"), City of Estell Manor and Mayor of

Estell Manor Joseph Venezia, violated their constitutional

rights.  In response to Plaintiffs' claims, Defendants move for Summary Judgment [Docs. 25 & 26].  For the reasons expressed below, Defendants' Motions for Summary Judgment will be granted.[1]

## I.   BACKGROUND[2]

This case involves very tragic facts and events.  On February 13, 2007, Plaintiffs' son, fifteen-year-old Raymond Lopez, was stuck and killed by a vehicle as he walked along Cumberland Avenue in Estell Manor, New Jersey.  Shortly after his death, his friends and parents erected a roadside memorial on Cumberland Avenue in the area where Raymond died.  On July 1, 2008, public safety concerns prompted Estell Manor Mayor Venezia to order the memorial's removal.  Upon learning of the memorial's removal, Lopez went to the Estell Manor public works building and demanded the memorial's reinstatement.  After a heated discussion, an employee of Estell Manor assisted Lopez with setting the memorial back where it was previously located on Cumberland Avenue.

When he arrived for work the following day, July 2, 2008, an

---

[1]  Although Plaintiffs amended their Complaint and removed all federal claims, the Court, on March 17, 2010, addressed the issue of its jurisdiction and declined to remand the case. *See* Docs. 19 & 20.

[2]  Given that the present matter comes before the Court by way of Defendants' Motions for Summary Judgment, Plaintiffs' evidence "is to be believed and all justifiable inferences are to be drawn in [their] favor." *See* <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).

employee of Estell Manor discovered roofing nails scattered in the parking lot and street in front of the public works garage and municipal building.  The employee informed the mayor who, subsequently, called the New Jersey State Police.  At approximately 5:56 a.m., New Jersey State Trooper Lucarini[3] arrived to investigate the complaint of criminal mischief.  During the course of his investigation, Lucarini spoke with both the employee and the Mayor of Estell Manor.  He learned "that there had been a problem with the Lopez family the day before over removal of the memorial and they had come to the public works garage demanding it be returned." (Doc. 28, ¶ 13).  In furtherance of his investigation into the criminal mischief complaint, Lucarini drove to Plaintiffs' residence to determine whether they had any information regarding the nails thrown in the roadway.

Upon Lucarini's arrival at Plaintiffs' residence, he followed a split-rail fence to an open driveway entrance and parked his car at the end of the driveway.  Despite Plaintiffs'

---

[3]  On approximately May 24, 2008, Lucarini was transferred from the Atlantic City Expressway to the Buena Vista Station. Between May 24, 2008 and June 28, 2008, Lucarini was on assignment with the State Police Academy assisting with firearms training.  On approximately June 29, 2008, Lucarini began assignment at the Buena Vista Station and, therefore, was dispatched from that location for approximately three days before the incident with Plaintiffs occurred.  Prior to Lucarini's arrival to investigate the criminal complaint of mischief, he never met any of the people associated with this case.

contentions, Lucarini did not observe any "no trespassing" signs posted along the fence line of Plaintiffs' property.[4]  Lucarini subsequently exited his patrol car and called for the homeowner. He received no answer.  After this failed attempt to contact Plaintiffs, Lucarini walked up the driveway until he observed a brown Doberman Pincher on the house porch.  Upon seeing Lucarini, the dog "began barking" at him and moved "off the porch" in his direction. Id. at ¶ 16.  As the dog continued to bark, Lucarini called out again for the homeowner while he backed down the driveway toward his patrol car.  Prior to reaching his vehicle, Lucarini observed a German Shepherd "running" along the tree line toward him. Id. at ¶ 17.  Lucarini "commanded" the dog to "heel" and "stop." Id.  Despite these calls, the dog, ironically named Trooper, continued to run toward him.  Trooper then "leaped aggressively" at Lucarini and landed approximately five feet in front of him. Id.  Fearful for his safety, Lucarini drew his service weapon and "fired three rounds from the hip-retention position as the dog was about to spring" on him. Id.  Lucarini's shots hit Trooper.  Both Trooper and the Doberman Pincher ran into the woods.

Shortly after the shots were fired, Lopez came out of the house and observed Lucarini "with his gun drawn demanding" that

---

[4]  Beyond the mere allegations in their Complaint, Plaintiffs failed to submit any evidence that their property was marked either as private or warned of the presence of dogs.

Lopez speak with him. (Doc. 34-2, ¶ 3).  Disregarding this command, Lopez reentered his house and phoned the police because he was unsure why Lucarini discharged his firearm on Plaintiffs' property.  After phoning the police, Lopez reemerged from his house and screamed "why did you shoot my fucking dog" at Lucarini. (Doc. 28, ¶ 18).  The aforementioned comment and Lopez's return to his house promoted Lucarini to conduct a pat-down frisk of Lopez's outer layer of clothing before initiating questioning.  The two individuals then discussed the shooting of Trooper and the incident involving the roofing nails at the Estell Manor public works garage and municipal building.  Lopez denied any involvement and did not provide any information regarding the scattered nails in the parking lots.  During the conversation Lopez and Pettit[5] expressed their displeasure regarding the removal of their son's memorial.  After Lucarini concluded his questioning, he departed Plaintiffs' residence and left the care of Trooper, the wounded dog, to Plaintiffs.

Plaintiffs subsequently took Trooper to the Animal Hospital of Millville and the Veterinary Hospital of the University of Pennsylvania, where emergency surgery was performed.  Trooper, perhaps true to his name, survived the surgery and recovered from the gunshot wounds.

---

[5]  The facts on record do not definitively establish when Pettit emerged from the house.  However, they do indicate she did not witness the shooting of Trooper.

On July 7, 2008, Plaintiffs filed a complaint with the New
Jersey State Police concerning Lucarini's actions.  An internal
investigation occurred.  At the conclusion of the investigation,
New Jersey State Police Major Daniel Cosgrove (hereinafter
"Cosgrove") concluded that "the shooting of the dog is
unfortunate," but Lucarini "was lawfully conducting an
investigation when he was about to be attacked by a dog" and
"used his duty weapon in self defense to prevent serious injury
to himself." (Doc. 34-4, Exhibit 4).  Cosgrove also determined
Lucarini's frisk of Lopez was "reasonable" based upon the
"circumstances" of the incident. Id.  Approximately one year
later, on June 25, 2009, Plaintiffs filed their Complaint in the
Superior Court of New Jersey, Atlantic County.  On July 28, 2009,
Defendants removed this action to federal court.  Plaintiffs
amended their Complaint and moved for remand, which was denied.
Several months later, Defendants moved for summary judgment.
Plaintiffs oppose entry of summary judgment.

## III. DISCUSSION

### A.   Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied
that "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260

7

F.3d 228, 232 (3d Cir. 2001).

###    B.    New Jersey Civil Rights Act Claims[6]

The New Jersey Civil Rights Act (hereinafter "NJCRA") was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under either the United States or New Jersey Constitutions. Slinger v. New Jersey, No. 07-5561, 2008 WL 4126181, * 5-6 (D.N.J. September 4, 2008), rev'd on other grounds 366 Fed. Appx. 357 (3d Cir. 2010); Armstrong v. Sherman, No. 09-716, 2010 WL 2483911, * 5 (D.N.J. June 4, 2010).  NJCRA provides, in pertinent part, a private cause of action to

> [a]ny person who has been deprived of any substantive
> due process or equal protection rights, privileges or
> immunities secured by the Constitution or laws of the
> United States, or any substantive rights, privileges or
> immunities secured by the Constitution or laws of this
> State, or whose exercise or enjoyment of those
> substantive rights, privileges or immunities has been
> interfered with or attempted to be interfered with, by
> threats, intimidation or coercion by a person acting
> under color of law.

N.J.S.A. 10:6-2(c).  This district has repeatedly interpreted NJCRA analogously to § 1983. See Chapman v. New Jersey, No. 08-4130, 2009 WL 2634888, *3 (D.N.J. August 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart"); Slinger, 2008 WL 4126181 at *5 (noting

---

[6]  For reasons unknown to the Court, both Count I and Count II of Plaintiffs' Amended Complaint seemingly allege violations of the NJCRA.  The Court will, therefore, merge the counts and analyze them similarly.

NJCRA's legislative history, this district utilized existing §
1983 jurisprudence as guidance for interpreting the statute);
Armstrong, 2010 WL 2483911 at *5 ("[T]he New Jersey Civil Rights
Act is a kind of analog to section 1983").  Therefore, the Court
will analyze Plaintiffs' NJCRA claims through the lens of § 1983.
See Hedges v. Musco, 204 F.3d 109, 121 n. 12 (3d Cir. 2000)
(concluding that New Jersey's constitutional provision concerning
unreasonable searches and seizures is interpreted analogously to
the Fourth Amendment) (citing Desilets v. Clearview Reg'l Bd. of
Educ., 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) ("We
are not persuaded that the New Jersey Constitution provides
greater protection under the circumstances of this case than its
federal counterpart. We note that in its T.L.O. opinion the New
Jersey Supreme Court analyzed the search and seizure issue under
the Fourth Amendment to the United States Constitution, and did
not suggest that New Jersey's organic law imposed more stringent
standards")).

        To state a claim under § 1983 and the NJCRA, a plaintiff
must establish that (1) the conduct deprived him of his rights,
privileges, or immunities secured by the Constitution or laws of
the United States or New Jersey and (2) the conduct challenged
was committed by a person acting under color of state law. Gomez
v. Toledo, 446 U.S. 635, 640 (1980); Shuman ex rel. Shertzer v.
Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005).

Government officials, however, may assert a defense of qualified immunity.  "'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Montanez v. Thompson, 603 F.3d 243, 249-50 (3d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815 (2009)); see Love v. New Jersey Div. of Youth & Family Serv., No. 07-3661, 2010 WL 2950019, at * 2 n. 10 (D.N.J. July 22, 2010) (holding that "as a legal matter, state officials sued in their individual capacity under the New Jersey Civil Rights Act do have a qualified immunity defense available to them").  A Court must undertake a two-step inquiry to determine the applicability of qualified immunity:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

Montanez, 603 F.3d at 250. "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). "Only if the plaintiff carries this initial burden must the

defendant then demonstrate that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of his actions." Id.  In determining whether a defendant is entitled to qualified immunity, the court may address either of the two prongs first.

Plaintiffs allege Defendants violated numerous provisions of the New Jersey State Constitution, particularly the right to be free from unreasonable searches and seizures, right to freedom of speech, right to be free from physical force asserted against them by police officers or other officials without lawful reason, right to own real personal property without unreasonable intrusive and violent interference by the police of other public officials, right to equal protection under the law and right to due process.[7]  Because a substantial number of Plaintiffs' allegations either involve or are dependent on Defendant Lucarini's conduct, the Court will first address his liability.

### 1.   Defendant Lucarini

The Court construes Plaintiffs' Amended Complaint to allege five NJCRA claims against Defendant Lucarini, unreasonable

---

[7]  The Court notes that Plaintiffs' NJCRA claims are difficult to discern.  As illustrative of this point, Plaintiffs allege several violations of the NJCRA without (1) identifying which Defendants violated those provisions or (2) explaining how they violated the provisions.  Moreover, most of Plaintiffs' claims are unsupported by any allegations or evidence.  Although Defendants' Motions parse through Plaintiffs' vague Complaint, the lack of clarity and specificity has made the Court's disposition of these Motions substantially more difficult.

seizure, unreasonable search, equal protection, due process and free speech claims.

### a. Seizure of Trooper

Plaintiffs claim Defendant Lucarini's shooting of their dog constituted an unreasonable seizure.  In response, Defendants contend Defendant Lucarini's conduct was reasonable.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  An "effect" includes a person's personal property. United States v. Place, 462 U.S. 696, 700-01 (1983).  Personal property is seized when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984).  Destruction of an individual's property represents a sufficiently meaningful interference with his possessory interest in that property as to constitute a seizure under the Fourth Amendment. Id. at 124-125.  In Brown v. Muhlenberg Township, 269 F.3d 205, 210 (3d Cir. 2001), the Third Circuit not only concluded that a dog is a property interest protected by the Fourth Amendment, but also that a police officer's shooting of a dog, which resulted in its death or destruction, constituted a seizure.[8] Brown v. Muhlenberg

---

[8]  Although the New Jersey Supreme Court has not specifically held that the New Jersey Constitution recognizes a dog as a protected property interest, this Court predicts it

Twp., 269 F.3d 205, 210 (3d Cir. 2001).  Although the dog, Trooper, in the present matter did not die as a result of the shooting, the Court assumes, without deciding, that the shooting and wounding of a dog by a law enforcement officer is a sufficiently meaningful interference with an owner's possessory interests in his property as to constitute a seizure.

Before a seizure arises to a constitutional violation, the Court must determine whether the interference was unreasonable. "The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against unreasonable searches and seizures." United States v. Sharpe, 470 U.S. 675, 682 (1985).  A seizure of property conducted without a warrant is presumptively unreasonable. Place, 462 U.S. at 701.  If the state's interest, however, is "sufficiently compelling" and if the "intrusion . . . is not disproportionate to that interest," a warrantless seize may nonetheless be reasonable. Brown, 269 F.3d at 210; see Place, 462 U.S. at 703 (stating that for a warrantless search to be reasonable, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion").

The state has an interest in restraining animals to protect the life or property of others. Brown, 269 F.3d at 210.  The

---

would reach the same conclusion as the Third Circuit.

amount of force utilized to restrain an animal waxes and wanes
with the danger it possesses. *See* Id. at 210-211.  The
destruction of an animal that poses little or no danger to the
life or property of others would constitute an unreasonable
seizure. *See* Id. at 211 (holding that an officer's destruction of
a dog that presented little or no danger to his life was an
unreasonable seizure).  The state's interest, however, may
justify the "extreme intrusion occasioned" by an animal's
destruction if that animal poses an "imminent danger" to the life
or property of others. Id. at 210-11; *see* Altman v. City of High
Point, North Carolina, 330 F.3d 194, 206 (4th Cir. 2003)
(concluding that an officer's destruction of a fleeing dog was
reasonable because he could not safely capture the reportedly
aggressive animal).  This decision regarding the quantity of
danger to life or property an animal possesses is not determined
by the subjective intent of the officer.  Rather, the officer's
actions are viewed from an objective prospective. Graham v.
Connor, 490 U.S. 386, 397 (1989) ("[T]he question is whether the
officers' actions are 'objectively reasonable' in light of the
facts and circumstances confronting them, without regard to their
underlying intent or motivation").  The Court has specifically
admonished that "[t]he calculus of reasonableness must embody
allowance for the fact that police officers are often forced to
make split-second judgments - in circumstances that are tense,

14

uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Id. at 396-97.  In other words, a court must substitute itself for the officer at the time the actions occurred and determine whether the officer's actions were objectively unreasonable. Altman, 330 F.3d at 205.

Although the wounding of the pet was unfortunate and likely traumatic to the owner, the Court concludes Defendant Lucarini's actions were reasonable.  In reaching this decision, the Court balances the interests of Defendant Lucarini in protecting himself with Plaintiffs' interest in their property, Trooper.  In their Opposition to Defendants' Motions for Summary Judgment, Plaintiffs primarily rely upon Brown.  However, contrary to Plaintiffs' contentions, Brown does not preclude entry of summary judgment on behalf of Defendant Lucarini.  In Brown, the Third Circuit concluded that the defendant police officer's conduct was unreasonable when he destroyed a dog that posed no imminent threat, was stationary, was not barking, was not acting aggressively and whose owner was nearby willing to assume custody. Brown, 269 F.3d at 209, 211.  The matter presently before the Court, however, could not be more dissimilar.  Here, Trooper was not stationary.  He was running toward Defendant Lucarini.[9] (Doc. 28, ¶ 17).  Trooper also ignored Defendant

---

[9]  Even though Trooper was on Plaintiffs' private property, Defendant Lucarini lawfully entered the property to investigate a criminal complaint of mischief.

Lucarini's commands to "stop" and "heel." Id.  Trooper then
"leaped aggressively" at Defendant Lucarini and landed
"approximately five feet in front" of him. Id.  Fearful for his
safety, Defendant Lucarini "fired three rounds as the dog was
about to spring." Id.  Although Plaintiffs were nearby in their
home, they did emerge or attempt to calm Trooper.  They only
appeared after the shots were fired.  The aforementioned facts do
not portray a calm dog; they indicate Trooper was acting
aggressively.

The reasonableness of Defendant Lucarini's actions are
especially illustrated by the timing of his decision to shoot
Trooper.  Trooper was not shot as he ran toward Defendant
Lucarini, nor was he shot after he "leaped aggressively" toward
him. Id.  Defendant Lucarini's decision to discharge his firearm
and utilize deadly force only occurred at the last possible
moment, "as the dog was about to spring." Id.  Based upon the
totality of Trooper's actions, this decision to shot a dog about
to "spring" and on the cusp of attacking was objectively
reasonable.  Defendant Lucarini, out of fear for his personal
safety, discharged his firearm because he believed he was in
imminent danger of being attacked or bitten by Trooper.

The Court acknowledges that no one can say for sure that
Trooper intended to attack the officer.  However, at the time
Defendant Lucarini fired his gun, he had no way to know Trooper's

16

true intentions only that he appeared ready to strike.[10]   If

Defendant Lucarini refrained from shooting Trooper and the dog

acted out his hostile demeanor as he appeared ready to do, the

time would have already expired for him to safety discharge his

sidearm in self defense. *See* Warboys v. Proulx, 303 F. Supp.2d

111, 118 (D. Conn. 2004).  Consequently, in that scenario,

Defendant Lucarini would be forced to defend himself by some

other means and, perhaps, risk serious injury or death. *See* Id.

The reasonableness standard does not require this type of wait

and see approach.  Defendant Lucarini need not wait until a

threat is literally within inches of striking distance before

utilizing deadly force.

Plaintiffs additionally contend Defendant Lucarini's actions

were unreasonable because he could have chosen another response

rather than shooting Trooper, such as calling Plaintiffs in

advance of his arrival or firing a warning shot.  This argument,

however, misconstrues the Supreme Court's interpretation of

reasonableness.  Reasonableness is not a rigid standard that

---

[10]   This is not a case where Defendant Lucarini had knowledge
of Trooper's friendliness or knew whether Plaintiffs kept dogs on
their premises. *See* The San Jose Charter of the Hells Angels
Motorcycle Club, 402 F.3d 962, 976 (9th Cir. 2005) (concluding
that the destruction of plaintiffs' dogs was unreasonable because
the search warrant entry team knew the dogs were on the property
and had over a week to prepare a plan on how to deal with them).
Defendant Lucarini did not have any previous encounters with
either Trooper or Plaintiffs, and the incident occurred on
approximately his fourth day dispatched from the Buena Vista
Station.

requires an officer to choose the single best possible response.
It's more variable.  The objective reasonableness standard
permits an officer to select his reaction from a smorgasbord of
alternative choices, with the single requirement that his action
be justified by the circumstances. *See* <u>Illinois v. Lafayette</u>, 462
U.S. 640, 647 (1983) (quoting <u>Cady v. Dombrowski</u>, 413 U.S. 433,
447 (1973) ("[t]he fact that the protection of the public might,
in the abstract, have been accomplished by 'less intrusive' means
does not, by itself, render the search unreasonable")); *see also*
<u>Hatch v. Grosinger</u>, No. 01-1906, 2003 WL 1610778, at * 5 (D.
Minn. March 3, 2003) (quoting <u>Schulz v. Long</u>, 44 F.3d 643, 649
(8th Cir. 1995) (addressing plaintiffs' argument that defendants
could have responded in a different manner, the court opined that
"the Fourth Amendment does not allow this type of Monday morning
quarterback approach because it only requires that the seizure
fall within a range of objective reasonableness")).  Defendant
Lucarini's decision to discharge his firearm was one of the many
split second judgments law enforcement officers must make.  The
facts[11] clearly indicate the circumstances were uncertain and
rapidly evolving.  The Court, therefore, concludes Defendant
Lucarini's decision on whether and what type of force to use was
well within the realm of reasonableness.  When confronted with an

---

[11]  Defendant Lucarini's affidavit is the only evidence
detailing the events leading up to and including the shooting of
Trooper.  Plaintiffs did not witness the shooting.

18

aggressive dog that made him fearful for his safety, Defendant Lucarini chose to shot Trooper.  This choice, whether right or wrong, is not for the Court to second guess because it was an objectively reasonable response to the circumstances Defendant Lucarini confronted.  In light of Defendant Lucarini's objectively reasonable conduct, the Court must conclude that the seizure was reasonable.  Accordingly, the Court need not determine whether the right was clearly established.  Defendant Lucarini is entitled to qualified immunity and summary judgment will be entered on his behalf.

### b. Search of Plaintiff Lopez

Plaintiffs contend Defendant Lucarini's pat-down frisk of Plaintiff Lopez constituted an unreasonable search.  Defendants opine that Defendant Lucarini's pat-down frisk was a reasonable search because he feared for his safety.

In <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court held that a law enforcement officer, without violating the Fourth Amendment, may briefly stop, detain and frisk an individual if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968).  The Court further opined that in determining the reasonableness of a frisk, a court must ascertain whether "the facts available to the officer at the moment of the seizure . . .

19

warrant a man of reasonable caution in the belief" that the suspect is armed. Id. at 21-22, 30 (citations and internal quotations omitted).  Consequently, Terry requires "two separate sets of articulable facts," one set justifies the stop and the other the frisk.[12] U.S. v. Focareta, 283 Fed. Appx. 78, 83 (3d Cir. 2008).  If an officer believes a suspect to be armed and dangerous, a frisk is justified and the officer may execute a pat-down search, Terry, 392 U.S. at 27, 30, which must be confined to the individual's outer layer of clothing and must be

---

[12]  Plaintiffs do not allege in their Complaint, nor argue in their briefing, that Defendant Lucarini's actions constituted a seizure of Plaintiff Lopez.  The Court, therefore, will not address whether Defendant Lucarini's actions constituted an unreasonable seizure. See U.S. v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2000) (noting that a protective Terry frisk may occur after either a consensual encounter or investigative stop).  Furthermore, there is no evidence on record to suggest that the encounter between Plaintiff Lopez and Defendant Lucarini was not a consensual encounter. See Florida v. Bostick, 501 U.S. 429, 434 (1991) ("Since Terry, we have held repeatedly that mere police questioning does not constitute a seizure").  However, because Plaintiffs argue Defendant Lucarini did not have any lawful basis to enter Plaintiffs' property, the Court will briefly address that claim.  Defendant Lucarini entered Plaintiffs' property during the course of his investigation into a criminal complaint of mischief.  Earlier in the morning, roofing nails were found in the parking lot of the Estell Manor municipal building and public works garage.  After speaking with Estell Manor's mayor and a township employee, Defendant Lucarini learned that the prior day Plaintiff Lopez was at the municipal building and was very upset over the town's removal of his son's memorial.  Based upon that information, Defendant Lucarini decided to question Plaintiff Lopez. See Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (noting that police officers may rely on a trustworthy second hand report if that report gives rise to a particularized suspicion of wrong doing).  Consequently, Defendant Lucarini possessed a lawful basis to enter Plaintiffs' property to question Plaintiff Lopez.

limited to discovering whether the individual is armed.  Beatty v. Twp. of Elk, No. 08-2235, 2010 WL 1493118, at * 11 (D.N.J. April 14, 2010).

As discussed in the preceding section, a court determines the reasonableness of an officer's actions by viewing the search from an objective viewpoint.  Furthermore, in assessing reasonableness, courts take into account the totality of the circumstances, which include the location, history of crime in the area, the suspect's nervous behavior or evasiveness and the officer's "commonsense judgments and inferences about human behavior."  Focareta, 283 Fed. Appx. at 83 (quoting Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (internal quotation marks and citations omitted).

In the present matter, Defendant Lucarini's affidavit indicated he conducted the pat-down frisk because he feared for his safety.  Upon entering Plaintiffs' property, Defendant Lucarini narrowly avoided an attack by Plaintiffs' dog.  After discharging his firearm in self defense, Plaintiff Lopez heard the shots and emerged from his house.  Ignoring Defendant Lucarini's commands for Plaintiff Lopez to speak with him, Plaintiff Lopez reentered the house.  Although Plaintiff Lopez asserts he reentered the house to telephone the police, Defendant Lucarini could not possibly known that fact in that time frame.  Shortly thereafter, Plaintiff Lopez reemerged from the house and

21

yelled "why the fuck did you shoot my dog." (Doc. 28, ¶ 18). This expletive, combined with Plaintiff Lopez's reentry of his house, led Defendant Lucarini to conduct a pat-down frisk.

The Court finds the pat-down frisk reasonable. Already fearful for his safety because of the incident with Trooper, Defendant Lucarini encountered Plaintiff Lopez, swearing and angry. Defendant Lucarini had no way to ascertain or know why Plaintiff Lopez not only ignored his initial command to speak with him, but also why Plaintiff Lopez reentered his house after their first and brief encounter. *See* <u>United States v. Connolly</u>, 349 Fed. Appx. 754, 757 (3d Cir. 2009) (finding that an officer had reasonable suspicion to justify a frisk when after the officer identified himself the suspect placed his hands into his pants and refused to remove them). Although Plaintiff Lopez claims he stepped inside to call the police, a claim we accept as true, from Defendant Lucarini's prospective, Plaintiff Lopez could have reentered his home to retrieve a firearm because he was upset, angry or distraught over the shooting of Trooper. Defendant Lucarini did not witness the actions inside Plaintiff Lopez's home and, therefore, could not know what to expect when Plaintiff Lopez reemerged from his residence. The reasonableness of Defendant Lucarini's pat-down frisk is further supported by Plaintiff Lopez's statement, made immediately upon his re-emergence, "why the fuck did you shoot my dog." (Doc. 28, ¶ 18).

This statement conveys hostility and anger.  That animosity, combined with the unknown element of what Plaintiff Lopez did inside his home, justifies the frisk.  Consequently, based upon Plaintiff Lopez's actions and temperament, it was entirely reasonable for Defendant Lucarini to fear for his safety and believe Plaintiff Lopez possessed a weapon. *See* <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972) ("The policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect").  Accordingly, Defendant Lucarini is entitled to qualified immunity and summary judgment will be entered on his behalf.

### C. Equal Protection Claim

The Fourteenth Amendment prohibits a state from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  In other words, a state must treat all similarly situated persons similarly. <u>Shuman ex rel. Shertzer</u>, 422 F.3d at 151.  To properly plead an equal protection claim, a plaintiff must establish that "the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose." <u>Carrasca v. Pomeroy</u>, 313 F.3d 828, 834 (3d Cir. 2002). "In other words, [a plaintiff] must demonstrate that [he] received different treatment from that received by other individuals similarly situated." <u>Shuman ex rel.</u>

23

<u>Shertzer</u>, 422 F.3d at 151.  Plaintiffs' claims fail for several reasons.  Not only do Plaintiffs not plead the existence of purposeful discrimination, but also they do not offer any evidence indicating Defendant Lucarini treated them differently from other individuals similarly situated.  Accordingly, the Court need not determine whether the right was clearly established.  Defendant Lucarini is entitled to qualified immunity and summary judgment will be entered on his behalf.

### D.  Due Process

A state may not deprive an individual of his property without due process of law.  The destruction of an individual's property by a state constitutes a deprivation and, therefore, requires due process.  <u>Brown</u>, 269 F.3d at 213.  Generally, the process that is due "must be afforded before the deprivation occurs" - pre-deprivation process. <u>Id.</u>  When the deprivation is "random and unauthorized," however, "the very nature of the deprivation ma[kes] pre-deprivation process impossible." <u>Id.</u> (quoting <u>Zinermon v. Burch</u>, 494 U.S. 113, 137 (1990)).  Consequently, in those instances, the state need only provide post-deprivation process. <u>Id.</u>

The Third Circuit has held that a dog's destruction does not warrant pre-deprivation process.[13] <u>Id.</u>  In those instances, to

---

[13]  The Court assumes, without deciding, that the shooting and wounding of a dog constitutes sufficient destruction of property to warrant a due process violation and a post-

comply with the due process clause, the state need only provide a post-deprivation remedy, a suit for damages. <u>Id.</u>  In the instant matter, New Jersey provides a post-deprivation remedy in the form of a lawsuit for damages. *See* N.J.S.A. 59:2-2 ("A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances"); *see also* <u>Trader v. New Jersey, Div. of State Police</u>, No. 05-4065, 2006 WL 2524172, at * 5 (D.N.J. Aug. 29, 2006) (noting that the plaintiffs' procedural due process claim must be dismissed because the New Jersey Tort Claims Act "provides an adequate post-deprivation remedy for the unauthorized deprivation of property by public employees"). Accordingly, the Court need not determine whether the right was clearly established.  Defendant Lucarini is entitled to qualified immunity and summary judgment will be entered on his behalf.

### E.  Freedom of Speech

The Court construes Plaintiffs' freedom of speech claim to allege that Defendant Lucarini unconstitutionally interfered with the roadside memorial for Plaintiffs' deceased son.  The Court will enter summary judgment in favor of Defendant Lucarini because there is no evidence on record, nor any allegation in Plaintiffs' Amended Complaint, that Defendant Lucarini

---

deprivation remedy.

unconstitutionally interfered with the roadside memorial or Plaintiffs' freedom of speech.[14]  Defendant Lucarini is entitled to qualified immunity and summary judgment will be entered on his behalf.

### 2.  Defendants State of New Jersey and New Jersey State Police

Summary judgment will be entered in favor of Defendants State of New Jersey and New Jersey State Police.  All claims against these Defendants were predicated upon the unconstitutional conduct of Defendant Lucarini. See Brown, 269 F.3d at 214 ("Because the civil rights act liability of the remaining defendants is predicated on there being a constitutional violation committed by [the] Officer . . . we will hereafter confine our discussion to civil rights liability in connection with the possible" violation committed by the officer).  Since the Court concluded Defendant Lucarini's actions were constitutional, summary judgment will be entered in favor of Defendants State of New Jersey and New Jersey State Police.[15]

---

[14]  The Court additionally holds that even if Defendant Lucarini's conduct violated the First Amendment, he would be entitled to qualified immunity because the right to erect a roadside memorial is not a clearly established constitutional right.

[15]  Even if Defendant Lucarini's actions were unconstitutional, and he was not entitled to qualified immunity, summary judgment remains appropriate for Defendants New Jersey State Police and State of New Jersey because they are immune from suit under the Eleventh Amendment. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989) (stating that § 1983

### 3.  Defendants Estell Manor and Mayor of Estell Manor Venezia

Plaintiffs allege a plethora of claims against Defendants Estell Manor and Mayor of Estell Manor Venezia.  Summary judgment will be granted with respect to the claims that relate to Defendant Lucarini[16] because the Court determined that his conduct did not violate any constitutional rights.[17]  *See* Brown,

---

"provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.  The Eleventh Amendment bars such suits unless the State has waived its immunity"); *see also* Trader, 2006 WL 2524172 at * 4 (noting that the New Jersey State Police are an "alter ego of the state" and entitled to sovereign immunity).

[16]  This includes the search, seizure, due process and equal protection claims that relate to Defendant Lucarini's conduct.

[17]  Even if the Court concluded Defendant Lucarini violated the Constitution, summary judgment would still be appropriate because Defendants Estell Manor and Mayor of Estell Manor Venezia did not have any personal involvement with the alleged deprivations of constitutional rights.  A municipality cannot be held liable under Section 1983 for the actions of its agents or employees under a theory of respondeat superior.  Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995).  "Personal involvement" must be shown "through allegations of personal direction or of actual knowledge and acquiescence."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  The record is void of any facts that indicate Defendants Estell Manor and Mayor of Estell Manor Venezia had any involvement, actual knowledge or acquiesced regarding Defendant Lucarini's conduct at Plaintiffs' residence.  Although Plaintiffs claim Mayor Venezia directed "the State Police to investigate something at our house having to do with the roadside memorial," (Doc. 34-2, Exhibit 2), there is no evidence, beyond this conclusory statement, that Defendants Estell Manor and Mayor Venezia directed Defendant Lucarini to act in the manner he did.  The only interactions between Defendant Lucarini and Defendants occurred when the Mayor called the New Jersey State Police to report the criminal mischief complaint and when he informed Defendant Lucarini about the memorial related

269 F.3d at 214 ("Because the civil rights act liability of the remaining defendants is predicated on there being a constitutional violation committed by [the] Officer . . . we will hereafter confine our discussion to civil rights liability in connection with the possible" violation committed by the officer).

### a.  Free Speech, Equal Protection and Due Process Claims

The Court construes Plaintiffs' free speech, equal protection and due process claims against Defendants Estell Manor and Mayor of Estell Manor Venezia to arise from the removal of the roadside memorial for Plaintiffs' son.  The Court concludes Defendants Estell Manor and Mayor of Estell Manor Venezia did not violate Plaintiffs' free speech, equal protection or due process rights.  With respect to Plaintiffs' free speech claim, the Roadside Sign Control and Outdoor Advertising Act (hereinafter "COAA") regulates and specifically prohibits the erection of roadside memorials on utility polls. NJSA 27:5-9(f) ("A sign may

---

incidents with Plaintiff Lopez.  As part of his duty to investigate complaints, Defendant Lucarini went to Plaintiffs' residence.  In no way do these facts provide evidence that Estell Manor or Mayor Venezia controlled Defendant Lucarini or directed him to act in the manner he did.  Furthermore, New Jersey case law specifically holds that municipal officials cannot dictate orders to the state police. *See* <u>Tull v. State</u>, 310 A.2d 502, 505 (N.J. Super. Ct. App. Div. 1973) ("The interests of the State would be ill-served and the cooperation statute, N.J.S.A. 53:2-1, possibly thwarted if the State Police, viewed as agents of the summoning municipality, were subject to its every order . . .")

not be painted, drawn, erected or maintained upon trees, rocks, other natural features or public utility poles"). The memorial in the current matter constituted a sign as defined in the COAA. *See* NJSA 27:5-7 (defining sign to mean "outdoor display . . . on real property" that attracts, either through design or unintentionally, motorists, passengers or pedestrians). The COAA further provides that Defendants Estell Manor and Mayor of Estell Manor Venezia are under a duty to enforce the roadside act and remove items that violate the act. *See* NJSA 27:5-23 ("It shall be the duty of . . . local government and . . . all . . . municipal officers charged with the enforcement of State and municipal laws . . . to assist in the enforcement of the provisions of this act and the orders issued, or rules or regulations adopted pursuant to this act"); *see also* <u>Philadelphia Outdoor v. New Jersey Expressway Auth.</u>, 534 A.2d 77, 83 (N.J. Super. Ct. App. Div. 1987) (holding that the act and its regulations do not violate the First Amendment). The Court, therefore, concludes that summary judgment will be entered on behalf of Defendants Estell Manor and Mayor of Estell Manor Venezia because they did not violate Plaintiffs' right to free speech.[18] With respect to Plaintiffs' equal protection and due process claims, summary

---

[18] The Court additionally holds that even if Defendants Estell Manor and Mayor of Estell Manor Venezia's conduct did violate the First Amendment, they would be entitled to qualified immunity because the right to erect a roadside memorial is not a clearly established constitutional right.

judgment will be entered in favor of Defendants Estell Manor and Mayor of Estell Manor Venezia because the record is void of any facts regarding how Plaintiffs were treated differently or that Plaintiffs were deprived of any due process.[19]

## C. Plaintiffs' state tort claims

Plaintiffs assert that Defendants committed several state torts, including assault and battery, intentional infliction of emotional distress and negligent infliction of emotional distress.  Defendants contend summary judgment should be entered on their behalf because they are entitled to good faith immunity under the New Jersey Tort Claims Act (hereinafter "NJTCA").

The NJTCA provides that a "public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J.S.A. § 59:3-3.  In ascertaining whether good faith immunity exists, the New Jersey Supreme Court opined that "our courts have ruled that to obtain summary judgment, a public employee must establish that her conduct was objectively

---

[19]  Alternatively, summary judgment is appropriate for Defendants Estell Manor and Mayor of Estell Manor Venezia because Plaintiffs admit in their Amended Complaint that after the memorial was initially removed, it was "returned . . . to its original location." (Doc. 21, Compl. ¶ 14).  Since the memorial was quickly returned, the remedy for any potential constitutional violation is nominal.  The Court further notes that even if a constitutional violation occurred, Defendants Estell Manor and Mayor of Estell Manor would still be entitled to qualified immunity because the equal protection and due process rights to either erect a roadside memorial or stop its removal are not clearly established constitutional rights.

reasonable." <u>Fielder v. Stonack</u>, 661 A.2d 231, 246 (N.J. 1995). The New Jersey Supreme Court further clarified that "[t]he same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the Tort Claims Act." <u>Wildoner v. Borough of Ramsey</u>, 744 A.2d 1146, 1153 (N.J. 2000).  Therefore, if the alleged tort and alleged constitutional violation arise out of the same conduct, and the Court concludes that no constitutional violation occurred because the public employee's actions were objectively reasonable, the NJTCA's good faith provision applies and bars prosecution of the tort claim.

     In the present matter, Plaintiffs' tort claims are barred by the NJTCA's good faith immunity provision.  Plaintiffs' allege Defendant Lucarini committed an assault and battery when he frisked Plaintiff Lopez.  The Court, however, concluded Defendant Lucarini's actions were objectively reasonable and that no constitutional violation occurred.  Therefore, pursuant to the NJTCA, Defendant Lucarini is entitled to immunity with respect to the assault and battery claim.  Plaintiffs additionally allege Defendants intentionally or negligently inflicted emotional distress on them by "violating their civil rights, entering their property for no lawful reason, threatening them, assaulting them, battering them, shooting their dog and refusing to assist Plaintiffs in dealing with the chaos and carnage that Defendants

caused." (Doc. 21, Compl. ¶ 38). This claim also fails because the Court concluded that either no constitutional violation occurred or that the respective public employees' actions were objectively reasonable.[20] The Court will, therefore, enter summary judgment in favor of Defendants.

**V. CONCLUSION**

For the reasons expressed above, Defendants' Motions for Summary Judgment [Docs. 25, 26] will be granted. An appropriate order will be entered.


Date: March 30, 2011                      s/ Noel L. Hillman
At Camden, New Jersey                 NOEL L. HILLMAN, U.S.D.J.

---

[20] With respect to the shooting of Plaintiffs' dog, Trooper, not only did the Court conclude Defendant Lucarini's actions were objectively reasonable, but also a recent New Jersey Superior Court decision, McDougall v. Lamm, reasoned that emotional distress damages were not available for the injury or death of a pet. McDougall v. Lamm, 2010 WL 5018258, at * 5 (N.J. Super. Ct. App. Div. Dec. 10, 2010). Furthermore, as an alternative holding, the Court finds that, based upon the facts in evidence, none of the Defendants' conduct was sufficiently outrageous as to constitute either intentional or negligent infliction of emotional distress.